UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In Re:                                          Bankruptcy No.:  07-60350
                                                Adversary No.:  07-06052
Todd Dewaine Freier,

                Debtor.

R&R Ready Mix, Inc.,                            **POST-TRIAL MEMORANDUM**

                Plaintiff,
        v.

Todd Dewaine Freier,

                Defendant.

## INTRODUCTION

The above matter came on for trial on the Complaint of R&R Ready Mix seeking

to have a debt it claims is owed to it by the Debtor nondischargeable.  The parties

stipulated to certain facts and the admission of Plaintiff's Exhibits 8-39 and Defendant's

Exhibit A and B.  Exhibits 1-7 were admitted with the understanding the characterization

in the Exhibits were not stipulated.  The Plaintiff represented that each entry

corresponded to the Bates Stamp page relating to bank deposits and checks.  The Debtor

asserts that he has no liability to the Plaintiff, as the debt is owed by T.F. Concrete, Inc.

The Debtor did not sign a guarantee of this debt, and the Plaintiff's claim is barred by the

Statute of Frauds.  Further, even if the Debtor was responsible for the debt, the Debtor

asserts that the Plaintiff failed to meet its burden of proof as to the elements of 11 U.S.C.

523(a)(2)(A) and (B) as well as 523(a)(4).

## FACTS

1.	The Debtor filed for relief under Chapter 7 of the United States Bankruptcy Court on or about June 11, 2007.

2.	The Debtor's Bankruptcy Schedules disclose R & R Ready Mix on Schedule F as a creditor holding a disputed, unsecured non-priority claim in the amount of $150,882.97. Schedule F indicates the debt was incurred for business expenses. (See Debtor's Exhibit A).   The amount of the claim listed within the Debtor's Schedule is equal to the amount of the State Court Judgment entered against the T.F. Concrete, Inc. in Douglas County District Court of Minnesota, Court File No.: 21-C7-05-001088, September 8, 2005.

3.	On September 9, 2007 the Plaintiff filed this Adversary proceeding alleging that the Debtor's obligation is non-dischargeable under 11 U.S.C. §523(a)(2), and 523(a)(4). The Plaintiff's claims to deny discharge under 11 U.S.C. §727(a)(2), (3), (4) or (5) have been dismissed.

4.	 The Debtor is the sole owner, shareholder, officer, and employee of T.F. Concrete, Inc. (T.F.), a Minnesota Corporation. T.F. is a building construction company which performed concrete work, masonry, and construction of residential building foundations.

5.	The Debtor is employed full-time throughout the year as a machine operator  with 3M Company in Alexandria, MN. The Debtor worked for T.F. as a part-time, seasonal employee, performing concrete work in the evenings and on weekends generally from mid-April until mid-November. The Debtor did not routinely perform concrete work during the winter months.

6. From 2003 through 2005 T.F.'s primary supplier of concrete was Plaintiff, R & R Ready Mix, Inc. T.F. Concrete, Inc. received concrete and related services as well as pumping services from Plaintiff on a credit basis in exchange for T.F.'s assurance it would pay for all materials and services provided by Plaintiff. There was no guarantee or other written agreement by the Debtor that he would pay the debt of T.F.

7. Debtor prepared all bids for concrete work performed by the T.F. When preparing bids, Debtor would try to include the cost of the concrete material and add 100% for his labor and profit when bidding concrete jobs. Exhibit 23 clearly demonstrates that T.F. did not always obtain the desired margin. Bates page 000551 shows material costs were $25,000.00 and labor was $12,150.00 on a $37,150.00 job. In other words, materials were 2/3 of the project and labor and overhead was 1/3. It was entirely up to the parties' negotiations as to the "profit margin." T.F. has no outstanding receivables owing from its customers. The Debtor testified that sometimes T.F. was not paid in full on the jobs. Further, at times, there were cost overruns due to uncompensated change orders, bidding errors, and problems with workmanship. Further, from the payments the Debtor received, transfers to compensate labor to subcontractor was required. In addition, T.F. had other normal operating obligations which had to be paid, including fuel, rebar, stakes, forms, repair and replacement of equipment, insurance, phone and secured debt payment.

8. By March, 2005 T.F. was indebted to Plaintiff in the approximate amount of $160,000.00 for unpaid concrete materials and pumping services and interest.

9. In December, 2004 discussions occurred between Debtor and Plaintiff concerning T.F.'s. outstanding account. David Ludeke, President of the Plaintiff,

testified that T.F was always slow in paying its material bill.  He was aware that T.F. was

a corporation and that the Debtor had no liability for the debt.  Mr. Ludeke knew that if

R&R ceased supplying materials to T.F., R&R would receive nothing on its bill as the

Debtor would file bankruptcy and T.F. would cease to exist.  All of T.F.'s assets would

go to secured creditors.  R&R knew the only way it could be paid was to keep T.F. in

business.  At that time, R&R requested a personal guarantee of T.F.'s debt from Todd

Freier.  The request was denied.  R&R chose not to place mechanic's liens on jobs T.F.

performed to obtain payment for materials because it was a small town and would cause

problems for T.F.and possibly R&R.  R&R agreed to term out the debt of T.F. and agreed

to payment amounts proposed by T.F.  R&R did not seek any security for its debt.  This

proposal was not consummated by payment on the part of T.F. or reduced to writing.

   10.  In February, 2005, Plaintiff commenced legal action against T.F. in

Douglas County District Court, Minnesota, Court File No.: 21-C7-05-001099, seeking

judgment for the unpaid materials and services. (See Complaint, Debtor's Exhibit B).

Discussions concerning T.F's obligation occurred between Debtor and Plaintiff following

service of the Complaint.  Again, R&R was advised that if the deal was made too harsh,

Todd Freier would file for bankruptcy and T.F. would fold.  The payment amounts

discussed were payments that Todd Freier believed that T.F. could make.  R&R, through

David Ludeke,  also believed that the payments were feasible.  Again, R&R did not

request a security interest in the assets of T.F.  A personal guarantee was requested from

Todd Freier, and Todd refused to provide the guarantee.  Again, R&R knew that its only

hope to recover on the account was to accept the payment terms proposed and advance

new product to keep T.F. operating.  R&R knew that no other supplier would provide

material to T.F.  R&R also did not seek a lock box arrangement for the proceeds from jobs or place materialman's liens on the property where the material was to be supplied to protect R&R's interest.

11.     As part of the  settlement discussions, Todd Freier, as President of T.F., completed a Corporate Financial  Statement dated March 7, 2005 in which  corporate assets were represented to be $96,234.00 and corporate liabilities were $85,800.00.   The only creditors listed on the financial statement were Hometown Community Bank, Bremer Bank, N.A., and GMAC.  No other liabilities, debts, or unpaid invoices outstanding to any other entity were stated.  David Ludeke saw the balance sheet and immediately recognized that it was not complete.  Mr. Ludeke saw that the statement did not contain the debt owed to R&R.  If that debt was included, T&F's liabilities exceeded its assets by in excess of $150,000.00.  Further, the statement did not contain any listing of accounts, equipment, motor vehicles and other assets of T.F.  The statement said that T.F. had granted no security interest while it also disclosed that GMAC was owed money on a pickup truck.  The statement listed securities of $96,234.00, but did not disclose what these securities were in the stock section.  The statement said that T.F. was not a defendant in a lawsuit, even though R&R had caused T.F. to be sued in February of 2005 on the obligation.  Mr. Ludeke admitted he saw these discrepancies, but took no steps in investigating further.  Mr. Ludeke admitted that he knew T.F. was insolvent and by in excess of $150,000.  Mr. Ludeke caused R&R to proceed with the agreement with full knowledge of this fact.

Kim Moske, business manager for R&R Ready Mix also testified.  Mr. Moske saw the same statement and recognized the discrepancy listed above.  She agreed that it

raised red flags but did not ask for further informative or investigate because David Ludeke wanted to accept the proposal from T.F. David was the President and made the decisions for the corporation. Again, David Ludeke knew that R&R's only chance to recover anything was to go along with the agreement and keep T.F. in business.

Todd Freier testified that he didn't know why R&R asked for the financial statement. Todd knew that R&R was going along because it wanted to recover on its unsecured debt and the only way R&R was going to recover anything was if T.F. continued to operate. Todd went to Home Depot and bought a form financial statement. He placed $94,634.00 in the securities portion because Todd knew that was the number the T.F. accountant utilized in T.F.'s Minnesota tax return for fiscal assets of T.F., plus a small amount. Todd Freier testified he didn't know how the tax return values were arrived at or worked. Todd Freier relied upon the accountant for T.F. Concrete to perform the calculations correctly. Plaintiff's Exhibit 29, Bate Stamp page 000576, shows fiscal assets of a little over $93,000. Todd Freier did not have an appraisal done. He also put down the secured debt and wrote N.A. on the other items because he did not understand them. He did not read the form, and took approximately five minutes to fill it out.

12.     Plaintiff asserts that it relied upon representations by Debtor as to the assets and liabilities of T.F., the ongoing business viability of T.F., and the ability of T.F. to make the payments as proposed by Debtor. (See Complaint, Paragraph IX, Debtor's Exhibit 2). The Defendant asserts that any reliance was not reasonably based upon the discrepancies and red flags raised by the document from its face.

13.    The settlement negotiations and representations of the parties resulted in a

Settlement Agreement dated March 31, 2005 in which T.F. and Plaintiff acknowledged

that T.F. owed $159,961.07 with interest and finance charges accruing from and after

January 31, 2005.  T.F. agreed to make payments as follows:

a.    $1,000 upon execution;
b.    $500 on or before April 10, 2005;
c.    $10,000 by May 10, 2005;
d.    $7,000 on or before the 10th day of each month for the months of June
        through December, 2005;
e.    $500 per month from January through April, 2006;
f.     $7,000 per month on or before the 10th of each month for the
        months of June through December, 2006;
g.    The entire balance due and payable in full no later than December
        31, 2006.

If T. F. did not make the required payments, Plaintiff was entitled to default judgment.

Plaintiff agreed to continue supplying concrete products to T.F. on an ongoing credit

basis provided T.F. was not in default under the terms of the agreement and provided T.F.

kept current the account for new products.  David Ludeke testified that R&R did not

request any security for the obligation owed it by T.F.  Further, the Settlement Agreement

does not restrict the use of T.F.'s income.  In particular, there were no restrictions placed

upon officer draws, compensation or capital purchases, as is common in many loan

agreements with lending institution in work-out situations. Debtor was not represented by

an attorney during the course of the settlement negotiations with Plaintiff. Debtor did not

sign a personal guarantee of the T.F. Concrete, Inc. debt with Plaintiff at any time.  Todd

Freier believed that T.F. would make the payments set forth above when he executed the

agreement on behalf of T.F.

David Ludeke testified that he looked at R&R's projections and believed that it was possible to make the payments. This was true even though Mr. Ludeke knew that T.F. failed to make payments before. In fact, T.F. incurred an outstanding liability of approximately $160,000.00. Mr. Ludeke believed that T.F. could pay for its materials, its overhead and pay the outstanding bills over time with interest at 18%. Mr. Ludeke is in the concrete business and has acted as the President of R&R for 8 years. Mr. Ludeke is familiar with business and it would be expected he would know the margins concrete installation companies achieve. Mr. Judeke also knew the history of T.F.

Between March, 2005 and July 30, 2005, T.F. Concrete paid for new materials through June and paid $25,500.00 on the old debt. However, the settlement was not feasible as the operating costs of T.F. Concrete did not permit the payments to be made at the level agreed to.

14.    By August, 2005 T. F. had defaulted upon the payment schedule. On August 25, 2005, Plaintiff sent T.F. a notice of default of the Settlement Agreement. (See Exhibit 19).

15.    The notice identified T. F.'s. failure to make the $7,000 payment of August 10, 2005, and that T.F. still owed for the July statement in the amount of $11,283.63, and August payment of $18,851.64. R&R demanded payment on or before August 26, 2005 in the amount of $37,135.27. The payment could not be made.

16.    On September 20, 2005 T.F. purchased a brand new 2006 Chevrolet Pickup for $40,000.00 from Schwieters Chevrolet. T.F. Concrete, Inc. traded a 2003 Chevrolet Crew Cab Pickup plus $5,000 cash. The balance was financed through GMAC with monthly payments of $716. 00 per month. At this time T.F. also leased a 2004

Chevrolet Pickup with 17,000,00 miles for which it was paying $460 per month. Thereafter, T.F. continued to lease the 2004 pickup and the 2006 pickup with a combined monthly payment of $1,176 per month despite Todd Freier being the sole employee, shareholder, officer, and director.

17.     The 2003 Chevrolet warranty expired.  The actual increase of monetary cost to T.F. Concrete was $70.00 per month in payments.  Todd Freier expected to recover this through lower fund costs (the new vehicle was a diesel) and lower maintenance and repair costs.

18.     Pursuant to the terms of the Settlement Agreement, Judgment was entered against T.F. on September 8, 2005 in the amount of $150,882.97 (See Exhibit 20).

19.     Plaintiff attempted to collect the debt owed by T.F. following Entry of Judgment. Plaintiff served T.F. with Collection Interrogatories and Request for Production of Documents. Plaintiff learned that T.F. had performed concrete services on a residential construction project, and Plaintiff served a Garnishment Summons upon the project's owner in an attempt to garnish the payment for work on the project. (See Garnishment Summons at Exhibit 22).

20.     Even though the Garnishment Summons erroneously referred to the Debtor as "Todd Freier as President of T.F. Concrete, Inc.," personal liability for that judgment had never been extended to Debtor in his personal capacity.

21.     The garnishment attempt was unsuccessful, as T.F. had already been paid $37,150.00 as payment in full for concrete and labor on the project. (See Exhibit 23).

22.     In March, 2006,  T.F. presented another payment proposal to Plaintiff for monthly payments of $2,670.40 per month commencing May 10, 2006 at 4% interest

over a five year term. (See Exhibit 21).  One monthly payment was made on this proposal.  However, R&R caused a garnishment to be served (See paragraph 19 above), which demonstrated that it no longer would accept the settlement.

23.     On June 20, 2006 Plaintiff served T.F. with Post-Judgment Request for Production of Document and Things (See Exhibit 24). In part, discovery asked for disclosure of all people for whom T.F. was scheduled to do work during 2006 and for a description of the type of work to be performed along with the invoice or bid evidencing such work.

24.     Debtor responded in a letter dated August 14, 2006 as President of T.F. indicating that there were currently no work orders for T.F., nor did T.F. have any outstanding bids or proposals. (See Exhibit 25).

25.     On July 28, 2006 Debtor caused a new corporation to be formed under the name of Concrete Products, Inc.  Concrete Products, Inc. is a Minnesota Corporation, and performed the exact same work and services as T.F.  Debtor was the sole shareholder, officer, director, and employee of Concrete Products, Inc. just as he was the sole owner, director, shareholder and employee of T.F. (See Exhibit 26).

26.     In September 2006, Concrete Productions Inc began conducting business using all of the tools, machinery and equipment belonging to T.F. without payment to T.F.  However, Concrete Production, Inc. did make payments on behalf of T.F. to T.F.'s secured creditors, including GMAC, Bremer Bank and Hometown Community Bank. The tools and equipment had a maximum value of $40,000.00.

27.     Debtor acknowledged in Answers to Interrogatories that he formed the new corporation because T.F. was unable to purchase raw materials or pay its debts as

they became due.  The only way any type of business could be done was through a new corporate entity.  The Debtor spoke to an attorney who provided advice regarding this matter. (See Exhibit 35).

28.     Debtor continued to perform concrete services as an employee of Concrete Productions, Inc. for the remainder of 2006.

29.     On April 23, 2007 Debtor was served with a Complaint in Douglas County District Court, State of Minnesota, by Plaintiff R & R Ready Mix, Inc. vs. T.F. Concrete, Inc., Todd Freier, and Concrete Productions, Inc. The State Court Complaint sought to pierce the corporate veil to extend personal liability of the debts of T.F. to Debtor, and to extend liability for T.F.'s debts to Concrete Production Inc. on the theory of successor liability.  (See Complaint at Exhibit 27).  No Answer to the Complaint was served or filed.  At that point, this case was filed.

30.  Debtor completed a personal Financial Statement to Bremer Bank on October 19, 2006 on which he listed the assets of T.F. to be $35,000.00. (See Exhibit 34).

31.     Plaintiff is seeking to deny Debtor a discharge under 11 U.S.C. §523(a)(4). As a basis Plaintiff asserts that Debtor as the sole shareholder, officer, director, and employee of T.F. owed a fiduciary duty to T.F. and its creditors and that Debtor committed fraud and/or defalcation while acting in his fiduciary capacity. Plaintiff asserts that Debtor's fiduciary duties are created in part by State Law pursuant to <u>Minn</u>. <u>Stat</u>. §§302A.251, 302A.361, 302A.551, <u>Snyder Electric Company v. Fleming</u>, 305 N.W. 2d 863 (Minn. 1981), <u>Westgore v. Grimm</u>, 318 N.W. 2nd 56 (Minn. 1982); <u>Minn</u>. <u>Stat</u>. §520.01, Subd. 3; <u>Minn</u>. <u>Stat</u>. §514.02, Subd. 1.

32.     Debtor asserts that there was no express trust or technical trust in existence between the Debtor and Plaintiff as contemplated by 11 U.S.C. §523(a)(4).

### STANDARD FOR DENIAL OF DISCHARGE

The standard of proof in exception to discharge is preponderance of the evidence *Grogan* v. *Garner*, 498 U.S. 279 (U.S. 1991).  Normally, exceptions to discharge are to be narrowly construed against a creditor and liberally in favor of debtor.  In re *VanHorne*, 823 F.2d. 1285, 8th Cir. 1987.

### FRAUD UNDER 11 U.S.C. §523(a)(2)(A)

To except a debt from discharge for money obtained  by debtor's false pretenses, false representation or actual fraud, other than a statement respecting the debtors or an insider's financial condition, a creditor must prove the following:

1.      the debtor made a false representation;

2.      that the debtor knew at the time that the representation was false;

3.      that the debtor made the representation deliberately and intentionally with intention and purpose of deceiving creditor;

4.      that the creditor justifiably relied on such representation; and

5.      that the creditor sustained alleged loss and damages as a proximate result.

In re *Ophaug*, 827 F.2d. 340, 8th Cir. 1987 as supplemented by *Field* v. *Mars*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Fed. 2d 351 (1995).  See 11 U.S.C. §523(a)(2)(A).

The fraudulent conduct complained of must be actual fraud and not fraud implied by reckless conduct.  See *American Title Insurance Co.* v. *Gramolino*, 183 565, 567-568, Bky. Ed.Mo. 1995.  A finding that the debt is non-dischargeable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law.  Actual

fraud is to the type involving moral turpitude, or intentional wrong and thus there can be no imputation of bad faith. Although overall financial condition may be relevant to establish an inference that the debtor incurred the debt maliciously and in bad faith, the hopeless state of the debtor's financial condition is never a substitute for actual finding of bad faith. *Anastas* v. *American Saving Bank*, (In re *Anastas*), 94 F.3d 1280, C.A.9, 1966.

False pretenses means implied misrepresentations or conduct intended to create and foster false impressions. To amount to Fraud, a statement must be made deliberately and intentionally with the intention and purpose of deception. *Lindau v. Nelson,357 BR508, 2006, WL 3391437 (8th Cir. BAP (Minn.)), 47 Bankr.Ct.Dec. 112* Omissions or failures to disclose may constitute grounds for non-dischargeability under 11 U.S.C. §523(a)(2)(A) where silence creates a false impression known by the debtor. *Peterson* v. *Bozzano*, (In re *Bozzano*) 173 B.R. 990, Bak. MD NC 1994). 11 U.S.C. §523(a)(2)(A) does not apply when representation of intent and ability to perform both must be implied. Misrepresentations of intention may constitute fraud, but failure to perform alone is not sufficient evidence of intent. *Catercorp, Inc.* v. *Henicheck*, 186 B.R. 211, 215, E.D. Va 1995. In the present case, there is no proof of these elements.

In the present case, there is a total absence of fraudulent representation on the part of the Debtor. The Plaintiff sold material for credit to T.F. Concrete, Inc. The Plaintiff knew it was dealing with TF and not the Debtor. R&R sued T.F. on its debt. TF Concrete and the Plaintiff entered into a Stipulation with regard to the debt. The Debtor did not guarantee the debt or performance on the part of TF Concrete. In fact, the Debtor refused to supply a personal guarantee of T.F. Concrete, Inc.'s debt. With this knowledge, R&R proceeded to enter into a Settlement Agreement with T.F. There was

no affirmative representation given to the Plaintiff by the Debtor regarding any ability on the part of TF Concrete to perform under the terms of the Stipulation. The Plaintiff did not seek or request any security for the debt or any other requirements on the part of the Debtor or T.F. other than as stated in the Settlement Agreement. There is a total absence of any of the proof that the Debtor made a statement which is false. There is a total lack of moral turpitude or intentional wrong on the part of the Debtor. The Court must find that the Plaintiff failed to prove its case, as the essential elements of actual fraud are lacking. The Plaintiff sold goods to a corporation on an unsecured basis and did not receive payment. Plaintiff could have filed mechanic's liens on the properties where the materials were used. The Plaintiff did not protect itself. This failure on the part of the Plaintiff does not make the debt non-dischargeable.

Further, even if a representation was made, the Plaintiff must prove that the Debtor knew the representation was false at the time it was made and that it was made with the purpose of deceiving the Plaintiff. The Debtor testified that T.F. could make the payments when he made the statement. In addition, both R&R's Chief Executive Officer and its Business Manager also testified that the payment schedule was feasible. The Plaintiff has the burden of proof to show that the Debtor knew that any statement he made with regard to T.F.'s ability to make the payment under the terms of Stipulation was false when he made the statement. The Plaintiff presented no evidence either direct or circumstantial that the Debtor knew T.F. could not and/or would not make the payments called for under the Stipulation. In fact, the evidence shows that in fact T.F. Concrete, Inc. made payments in the amount of approximately $25,500.00 in performance under the terms of the Stipulation. If the Defendant intended to deceive the

Plaintiff, left unexplained is why the Defendant's corporation would pay $25,500 between April 12 and July 20, 2005. The evidence clearly demonstrates that the Plaintiff failed to meet its burden of proof under 11 U.S.C. §523(a)(2)(A).

Further, the Plaintiff alleges that representation was made regarding the Debtor's taking draws from the corporations. The Debtor denies this representation was made. Further, the Plaintiff drafted the Settlement Agreement. If any limitation on the ability of T.F. to make capital purchases, make advances to shareholders, pay a salary to the Debtor or make other transfers was contemplated by the parties, surely this restriction would have been placed in the Settlement Agreement. An examination of Exhibit 18 reveals a total lack of such restriction on the use of corporate funds. The agreement between the parties did not require that the corporation keep the money in a separate account or refrain from using the concrete in any manner. The Plaintiff was represented by an attorney and the Debtor was not. It is inconceivable that the term would not be included in the Stipulation if it was material to the parties' Agreement.

These facts to not rise to the level of a non-dischargeable debt. If they did, anytime a Debtor fails to pay or perform a contract, the debt would be non-dischargeable. There is a total absence of the requisite fraudulent intent on the part of the Debtor for the debt to be found non-dischargeable under 11 U.S.C. 523(a)(2)(A). Non-compliance with the payment provision of the contract does not create a non-dischargeable debt.

## FALSE FINANCIAL STATEMENT IN WRITING
## 11 U.S.C. §523(a)(2)(B)

To prevail under 11 U.S.C. §523 (a)(2)(B), the Plaintiff must establish that the Defendant obtained the extension, renewal or refinancing of credit by (1) use of a statement in writing that was materially false; (2) that pertained to his or an insider's

financial condition; (3) on which the Plaintiff reasonably relied; and (4) that the Debtor made with intent to deceive the Plaintiff. See *Jacobus* v. *Binns*, 328 B.R. 126, 130 (8th Cir. BAP 2005).

A creditor must prove that it relied upon the Debtor's statement and that the reliance was reasonable. Reasonable reliance is determined by looking at the totality of the circumstances. *First National Bank of Olathe* v. *Pontow*, 111 F.3d. 604, 610 (8th Cir. 1997). *Guess* v. *Keim*, 236 B.R. 400, 402 (8th Cir. BAP 1999). Among other things, a court may consider whether there were any "red flags" that would have alerted an ordinary prudent lender to the possibility that the representations relied upon were not accurate and whether even minimal investigation would have revealed the inaccuracy of the Debtor's representation. *Pontow*, 111 F.3d at 610. The issue would be whether it was reasonable for the Plaintiff to rely upon the financial statement.

In the present case, there was a financial statement for T.F. Concrete, Inc. dated on March 5, 2005. The statement is wholly inadequate and should have placed the Plaintiff on notice that it was inaccurate. First, the statement does not list the $160,000.00 debt on which the Plaintiff sued the corporation. With knowledge of the debt owed, Plaintiff knew that the corporation was at least $150,000.00 under water at the time the agreement was executed. The Plaintiff's President and Business Manager testified that they knew that the financial statement was not complete and was inaccurate. The President said he knew about the debt to R&R and this omission did not concern him. The statement said that T.F. was not a Defendant in any suit or legal action. At that time, the Plaintiff had sued T.F. The statement provides that T.F. owned no personal property, had no accounts receivable, no automobiles (even though it shows that there is a

debt to GMAC on a 2003 Chevrolet). These statements and the known discrepancies would cause an ordinary lender to conduct at least a minimal investigation into the veracity of the assertion. The Plaintiff in the present case made no such investigation and its alleged reliance was unreasonable.

Further, the Plaintiff's President testified that R&R needed to keep T.F. in business if it was going to recover on any of T.F.'s debt. The alternative was to write off the debt owed it by T.F. The President knew that if R&R pushed too hard that Todd Freier would file for relief under Chapter 7. The Plainitff made the decision that it would restructure the debt of T.F. Concrete and advance new money based upon this knowledge. The financial statement was not the reason the Plaintiff drafted and executed the Settlement Agreement. The Plaintiff knew the statement was not accurate and cannot claim it reasonably relief upon the statement.

As a result of the Plaintiff's lack of reasonable reliance, the Plaintiff failed to prove the necessary elements of 11 U.S.C. §523(a)(2)(B).

## FIDUCIARY OBLIGATION

To prevent the discharge of Debtor's debt under the first prong of §523(a)(4), it is incumbent upon Plaintiff to establish the following three elements by a preponderance of the evidence: (1) an express trust exists; (2) that a fiduciary relationship existed between Debtor and Plaintiff; and (3) that Debtor committed fraud or defalcation in the course of that fiduciary relationship. See *Werner* v. *Hofmann*, (In re *Hofmann*), 144 B.R. 459, 463 (Bankr.D.N.D. 1992), aff'd, 161 B.R. 998 (D.N.D. 1993), aff'd, 5 F.3d 1170 (8th Cir. 1993).

Under the first two elements, the definition of "fiduciary," for purposes of §523(a)(4), is a question of federal law. See *Tudor Oaks Ltd. Partnership* v. *Cochrane* (In re *Cochrane*), 124 F.3d 978, 984 (8th Cir. 1997); *cert. denied,* 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998); *accord Mills* v. *Gergely* (In re *Gergely*), 110 F.3d 1448, 1450 (9th Cir. 1997). Within this confine, the term is limited to instances involving express or technical trusts, and, thus, is more narrowly defined than it is under the general common law. See In re *Cochrane*, 124 F.3d at 984; *Barclays Am./Bus. Credit, Inc.* v. *Long* (In re *Long*), 774 F.2d 875, 878 (8th Cir. 1985); *Bollinger* v. *Polk* (In re *Polk*), 183 B.R. 1020, 1022 (Bankr.E.D.Mo. 1995); *Itt Life Ins. Corp.* v. *Haakenson* (In re *Haakenson*), 159 B.R. 875, 887 (Bankr.D.N.D. 1993); *accord Miller* v. *J.D. Abrams Inc.* (In re *Miller*), 156 F.3d 598, 602 (5th Cir. 1998), *cert.denied,* 526 U.S. 1016, 119 S.Ct. 1250, 143 L.Ed.2d 347 (1999); see also *4 Collier on Bankruptcy* §523.10[1][C], at 523-73 (Lawrence P. King ed., 15th ed.rev. 1999) "[S]ection 523(a)(4), as it relates to a debtor acting in a fiduciary capacity, does not generally apply to frauds of agents, bailees, brokers, factors, and partners, and other persons similarly situated.") (footnotes omitted). Indeed, a fiduciary relationship can only arise from an express or technical trust "imposed before and without reference to the wrongdoing that caused the debt." In re *Cochrane*, 124 F.3d at 984 (quoting *Lewis* v. *Scott* (In re *Lewis*), 97 F.3d 1182, 1185 (9th Cir.1996) (internal quotation marks omitted); accord In re *Gergely*, 110 F.3d at 1451.

The Plaintiff claims that because the Debtor was the sole shareholder officer and director of a corporation, he had a fiduciary duty to creditors of the corporation written the meaning of 11 U.S.C. §523(a)(4). The Plaintiffs relies upon *Black, Inc.* v. *Decker*, 36 B.R. 452 for the proposition that a corporate officer is liable to 3rd party creditors as a

fiduciary. *Black* dealt with a claim by a corporation through its minority shareholder. Black, Inc. was of a corporation where Decker was President and Operating Manager. The Debtor, as President, failed to disclose transaction to the Board of Directors and shareholders when he was dealing with corporation controlled by Debtor. The Debtor also used corporate assets for his personal use and committed other breaches of his duty owed to the corporation and his fellow shareholders. The duty breached was not to creditor of the corporation. The present situation is clearly distinguishable, as the claim here is by a creditor of the corporation. As the Court states in Footnote 3 on page 878 of *Barclay*s:

> FN3. We are aware that many states, including Minnesota, statutorily define a corporate officer as a fiduciary with respect to the corporation and its shareholders. See Minn. Stat. §520.01. Draining a corporation's assets for the personal benefit of an officer may thus create a bar to discharge. *John P. Maguire & Co.,* v. *Herzog*, 421 F.2d 419 (5th Cir. 1970), and cases therein cited. <u>This is different, however, from making officers fiduciaries with respect to third party creditors, as Barclays would have us rule.</u> (Emphasis supplied.)

There is no fiduciary relationship between the Debtor and Plaintiff. The relationship is that of creditor (R&R) and the corporation debtor (T&F). The Debtor did not guarantee the debt and he has absolutely no liability for this debt.

Further, the Plaintiff asserts that *In Re Crea*, is not applicable and that §514.02, Subd. 1 somehow created a fiduciary relationship because of an amendment. However, *Gadtke* v. *Bren*, (In Re *Bren*) 284 B.R. 581, CD. Minn. 2002) while interpreting this statute specifically held that "if a trust is created by statute, it is not on express or technical trust, but are implied by law. A statute alone cannot, in the absence of the parties express intention, create an express or technical trust." See *Bren* at 697. There is nothing in the parties agreement which creates an Express Trust relationship regarding

the funds.  In fact, R&R specifically chose not to file or impose a mechanic's lien on the property where the materials were utilized.  There was no provision in the Settlement Agreement which required T&F to segregate payments in a lock box or a separate bank account from the projects to be sure that R&R received its money.  The parties' Agreement could have provided this type of restriction.  In fact, many lending agreements call for just this type of handling of the funds from construction projects.  The Agreement between the Plaintiff and T&F did not contain this type of agreement.  There simply is no trust relationship between the parties.  There was no fiduciary relationship required by §523 (a)(4)

In this proceeding, the Plaintiff must prove, by a preponderance of the evidence of each of the elements.

The Plaintiff cannot show that an express trust exists.  There is no document which was signed by the Debtor, and the express trust element is absent.

Next, the Plaintiff must show that the Debtor owed a fiduciary obligation regarding the trust.  Again, there is no Trust document which imposes obligations on the Debtor to hold the fund in Trust, and delineates powers which the Debtor has regarding the use of the Trust **res** and for whose benefit it is ultimately to be used.  This element is not met.

Finally, the Plaintiff must show that the **Debtor** breached his fiduciary duty by misappropriating the trust **res** or by failing to properly account for the Trust.  The Plaintiff cannot meet this standard.  There is a lack of proof that the Debtor misappropriated the Trust res, as there was no express trust.

The issue in this case is whether Todd Freier personally breached a fiduciary duty he had to the Plaintiff with respect to the misappropriation of Trust funds. The evidence is clear that the Debtor did not. There was no express trust and no trust funds with which to account. This fact is undisputed. There simply was no misappropriation or fraud on the part of the Debtor with regard to this transaction.

CONCLUSION

The debts of the Defendant are clearly dischargeable. The Plaintiff has failed to demonstrate any bad intention on the part of the Debtor with respect to this transaction. The Plaintiff has failed to meet his burden of proof and the Plaintiff's claim must be denied.

Dated this 27th day of June, 2008.

FLUEGEL, HELSETH, McLAUGHLIN,
ANDERSON & BRUTLAG, Chartered

by: _/s/ David C. McLaughlin_____
David C. McLaughlin  #127383
25 NW 2nd Street, Suite 102
Ortonville MN  56278
Telephone: (320) 839-2549
Fax: (320) 839-2540